FILED
Scott L. Poff, Clerk
United States District Court

By staylor at 2:57 pm, Apr 11, 2017

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# WAYCROSS DIVISION

| | |
|---|---|
| KASIM GANDY, | |
| Plaintiff, | CIVIL ACTION NO.: 5:16-cv-44 |
| v. | |
| TOM GRAMIAK; EDWINA JOHNSON; JOHN BOYETT; NATHAN BROOKS; WILLIAM STEEDLY; AUSTIN ADAMS; KIMBERLY LOWE; and UNIT MANAGER COX, | |
| Defendants. | |

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, an inmate at Ware State Prison ("WSP") in Waycross, Georgia, filed this cause of action pursuant to 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights. After the requisite frivolity review, Plaintiff's Complaint was served on Defendants. (Docs. 11, 13.)  Defendants then filed Motions to Dismiss based on Plaintiff's failure to exhaust his available administrative remedies and for failure to state a claim. (Docs. 21, 34.) Plaintiff filed Responses, and Defendants filed Replies. (Docs. 25, 28, 40, 45.)  For the reasons which follow, I **RECOMMEND** that the Court **GRANT IN PART AND DENY IN PART** Defendants' Motions to Dismiss, (docs. 21, 34).  Specifically, the Court should **GRANT** the October 19, 2016, Motion to Dismiss, (doc. 21), as to Defendants Johnson and Adams, and **DENY** the Motion as to Defendants Cox, Gramiak, Lowe, and Steedley.  The Court should **GRANT** the January 30, 2017, (doc. 34), Motion to Dismiss as to Defendant Boyett and **DENY** the Motion as to Defendant Brooks.

# BACKGROUND[1]

Plaintiff entered Ware State Prison on May 7, 2015. (Doc. 1-1, p. 3.) Upon arrival, prison officials placed Plaintiff in a Tier II Segregation Housing Unit based on his disciplinary history at Rogers State Prison. However, Plaintiff claims that he did not meet the prison's Standard Operating Procedure's requirements for placement in a Tier II Unit and that Defendants Brooks, Steedley, and Lowe failed to conduct an initial placement hearing allowing him to contest the assignment. (Id.)

Plaintiff also contends that the conditions of the Tier II Unit are drastically different from those in general confinement. Specifically, Plaintiff alleges, among other things, that cells in the segregation unit are stripped of any furniture, inmates are not afforded any out-of-cell recreation time, visitation and phone times are drastically limited, and inmates have restricted access to educational, religious, and vocational opportunities. (Id. at pp. 4–5.)

Plaintiff further claims that on January 25, 2016, Defendant Adams conducted a search of Plaintiff's cell and left it in disarray. When Plaintiff asked for a grievance form, Defendant Adams allegedly refused to give it to him and instead replied, "My dad runs the prison, what a grievance [sic]?" (Id. at p. 7.) Following this incident, Defendant Adams then began to harass Plaintiff by writing him up with false disciplinary reports and continuing to refuse him grievance forms. (Id. at p. 16.)

Furthermore, Plaintiff alleges that prison officials exposed Plaintiff to danger by forcing him to share a cell with another inmate, having faulty emergency call buttons, and denying medical care when his roommate attacked him with a razor. (Id. at p. 8.) Plaintiff claims that following this altercation with his cellmate, Defendants Cox, Steedley, and Lowe upgraded him

---

[1] The Court takes the following facts from Plaintiff's Complaint and construes them as true, as it must at this stage.

to the Tier II, Phase One unit, again without providing him an opportunity to contest the assignment.  (Id. at p. 11.)

Plaintiff's only remaining claims after frivolity review were his procedural and substantive due process claims and his retaliation claim against Defendant Adams.  (Doc. 10.)  Defendants Adams, Cox, Gramiak, Johnson, Lowe, and Steedley filed a Motion to Dismiss on October 19, 2016, arguing that Plaintiff failed to exhaust his available administrative remedies as to his retaliation claim against Defendant Adams, and failed to state a claim upon which relief may be granted.  (Doc. 21.)  Defendants Boyett and Brooks filed a similar Motion to Dismiss on January 30, 2017.  (Doc. 34.)  Plaintiff filed Responses to both Motions.  (Docs. 25, 40.)

## STANDARD OF REVIEW

Under a Rule 12(b)(6) motion to dismiss, a court must "accept[ ] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" does not suffice.  Ashcroft, 556 U.S. at 678.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal punctuation and citation

3

omitted). While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. Id.

## DISCUSSION

I. **Exhaustion of Plaintiff's Retaliation Claim Against Defendant Adams**

   A. **Standard of Review**

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense . . . is not ordinarily the proper subject for a summary judgment; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." Id. at 1374–75 (internal citation omitted). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id. at 1374 (internal punctuation and citation omitted). Further, a judge "may resolve factual questions" in instances where exhaustion of administrative remedies is a defense before the court. Id. In these instances, "it is proper for a judge to consider facts outside of the pleadings and to resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." Id. at 1376.

In Turner v. Burnside, 541 F.3d 1079 (11th Cir. 2008), the Eleventh Circuit Court of Appeals set forth a "two-step process" that lower courts must employ when examining the issue of exhaustion of administrative remedies. First, the court is to take the plaintiff's version of the

facts regarding exhaustion as true. Id. at 1082. If, even under the plaintiff's version of the facts, the plaintiff has not exhausted, the complaint must be dismissed. Id. However, if the parties' conflicting facts leave a dispute as to whether plaintiff has exhausted, the court need not accept all of plaintiff's facts as true. Id. Rather, "the court then proceeds to make specific findings in order to resolve the disputed factual issues[.]" Id. "Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." Id. at 1083. The Eleventh Circuit has held that a district court may consider materials outside of the pleadings and resolve factual disputes regarding exhaustion in conjunction with a Rule 12(b)(6) motion to dismiss so long as the factual disputes do not decide the merits of the case. See Bryant, 530 F.3d at 1376–77.

### B. Legal Requirements for Exhaustion

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002). Section 1997e(a) of Title 42 of the United States Code states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted." In Porter, the United States Supreme Court held that exhaustion of available administrative remedies is mandatory. Porter, 534 U.S. at 523; see also O'Brien v. United States, 137 F. App'x 295, 301–02 (11th Cir. 2005) (finding lack of exhaustion where prisoner "prematurely filed his civil complaint . . . and . . . 'failed to heed that clear statutory command' requiring that his administrative remedies be exhausted before bringing suit").

The requirement that the exhaustion of remedies occur "first in an agency setting allows 'the agency [to] develop the necessary factual background upon which decisions should be

5

based' and giv[es] 'the agency a chance to discover and correct its own errors.'" Green v. Sec'y for Dep't of Corr., 212 F. App'x 869, 871 (11th Cir. 2006) (quoting Alexander v. Hawk, 159 F.3d 1321, 1327 (11th Cir. 1998) (first alteration in original)).  Furthermore, requiring exhaustion in the prison setting "eliminate[s] unwarranted federal-court interference with the administration of prisons" and allows "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Woodford v. Ngo, 548 U.S. 81, 93 (2006).

The Supreme Court has noted exhaustion must be "proper." Id. at 92. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90–91.  In other words, an institution's requirements define what is considered exhaustion. Jones v. Bock, 549 U.S. 199, 218 (2007).

Thus, under the law, prisoners must do more than simply initiate grievances; they must also appeal any denial of relief through all levels of review that comprise the administrative grievance process. Bryant, 530 F.3d at 1378 ("To exhaust administrative remedies in accordance with the PLRA [(Prison Litigation Reform Act)], prisoners must 'properly take each step within the administrative process.'") (quoting Johnson v. Meadows, 418 F.3d 1152, 1157 (11th Cir. 2005)); Sewell v. Ramsey, No. CV406-159, 2007 WL 201269 (S.D. Ga. Jan. 27, 2007) (finding that a plaintiff who is still awaiting a response from the warden regarding his grievance is still in the process of exhausting his administrative remedies).

Furthermore, an inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA. Johnson, 418 F.3d at 1157–59; Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th

Cir. 2000) (inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). Additionally, "[t]he only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." Smith v. Terry, 491 F. App'x 81, 83 (11th Cir. 2012).

"However, 'while [Section] 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require more.'" Id. (quoting Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000)). The purpose of Section 1997e(a) is not that "fact-intensive litigation" result over whether every fact relevant to the cause of action was included in the grievance. Hooks v. Rich, CV605-65, 2006 WL 565909, at *5 (S.D. Ga. Mar. 7, 2006) (internal citation omitted). "'As long as the basic purposes of exhaustion are fulfilled, there does not appear to be any reason to require a prisoner plaintiff to present fully developed legal and factual claims at the administrative level.'" Id. (quoting Irvin v. Zamora, 161 F. Supp. 2d 1125, 1135 (S.D. Cal. 2001)). Rather, Section 1997e(a) is intended to force inmates to give state prison authorities a chance to correct constitutional violations in their prisons before resorting to federal suit and to prevent patently frivolous lawsuits. Id.

**C.    The Georgia Department of Corrections' Grievance Procedure**

The Georgia Department of Corrections' ("GDC") grievance procedure is set forth in Standard Operating Procedure ("SOP") IIB05-0001. (Doc. 21-2.) This SOP does not require an inmate to attempt an informal resolution of his complaint before filing a formal grievance. (Doc. 21-3, p. 5.) An inmate can file, with a few exceptions, "a grievance about any condition, policy, procedure, or action or lack thereof that affects the [inmate] personally." (Id. at p. 6.) Grievance forms must be available in the control rooms of all living units and must be provided upon request by an offender. (Id. at p. 5.) An inmate must submit a grievance form "no later

than 10 calendar days from the date the [inmate] knew, or should have known, of the facts giving rise to the grievance." (Id. at p. 8 (emphasis in original).)  A "calendar day" is "a 24 hour time period from midnight to midnight Monday through Sunday." (Id. at p. 3.)  The inmate must use the prison's grievance form when filing the original grievance, and he must sign the grievance form and give it to any counselor. (Id. at p. 8.)  The counselor then gives the inmate the bottom portion of the grievance form as a receipt and forwards the grievance to the Grievance Coordinator. (Id.)

The Grievance Coordinator is to screen the grievance to determine whether the warden should accept the grievance or reject it. (Id.)  The warden has a period of forty (40) calendar days from the date the inmate gave his grievance to the counselor to respond.  An extension of ten (10) calendar days can be granted once, provided the inmate is advised in writing of the extension before the original 40 calendar days have expired. (Id. at pp. 10–11.)  An inmate can file an appeal with the Commissioner's Office in the following instances: if the grievance coordinator rejects his original grievance; after the warden responds to the original grievance; or when the time allowed for the warden's decision has expired.  The inmate has seven (7) calendar days in which to file this appeal. (Id. at pp. 11–12.)  The Commissioner has 100 calendar days after receipt to render a decision. (Id. at p. 11.)  These time limits may be waived for good cause. (Id. at p. 12.)

### D.     Assessment of Plaintiff's Exhaustion

Plaintiff alleges in his Complaint that he exhausted all his available administrative remedies, but "never received a response with accords to Standard Operating Procedures[.]" (Doc. 1, pp. 3–4.)  Under the first Turner step, the Court must take Plaintiff's version of the facts regarding exhaustion as true.  Thus, taking these facts as true, Plaintiff pursued his grievance as

far as possible under the circumstances and, therefore, exhausted all *available* administrative remedies. However, in their Motion to Dismiss, Defendants argue that Plaintiff did not in fact exhaust his available administrative remedies as to his retaliation claim against Defendant Adams. In support of their argument, Defendants provide an affidavit from Edwina Johnson, Chief Counselor and Grievance Coordinator at WSP, copies of GDC's grievance SOP, and copies of Plaintiff's grievances. (Docs. 21-2–21-7.)

Because of these conflicting accounts, the Court must proceed to the second Turner step and make a factual finding to resolve the dispute. Under these findings, the Court can then determine whether Plaintiff exhausted his administrative remedies. Turner, 541 F.3d at 1082–83. Defendants aver, and Plaintiff does not contest, that Plaintiff only filed three grievances that bear any relation to his retaliation claims against Defendant Adams. (Doc. 21-2, p. 7.) Plaintiff filed the earliest of these grievances, Grievance No. 213175, on January 27, 2015. (Id.; Doc. 21-5.) Defendants notified Plaintiff on April 11, 2016 that this grievance had been denied. Plaintiff then appealed the denial on April 12, 2016. (Doc. 21-5, p. 4.) From that day, the Commissioner's Office had 100 calendar days, up until July 20, 2016, to respond to Plaintiff's Complaint. The appellate response was completed on July 20, 2016, but not acknowledged by Plaintiff until September 6, 2016. (Id. at p. 2.) Plaintiff filed this suit on June 6, 2016, more than one month before the Commissioner's 100-day response period had elapsed. Thus, it is apparent from the record that Plaintiff did not properly exhaust his available administrative remedies as to his retaliation claims against Defendant Adams prior to filing this suit. (Doc. 1.)

Furthermore, a review of Plaintiff's grievance history reveals that the grievance process was indeed available to him. Prior to bringing this cause of action, Plaintiff successfully filed eight formal grievances at WSP and appealed at least five of them. (Doc. 21-4.) Plaintiff loosely

9

argues that the grievance process was unavailable to him because the prison granted the warden a ten day extension several days after the original forty day deadline had expired. (Doc. 25, p. 3.) However, this argument has no bearing on the fact that inmates may file an appeal if the deadline for the warden's time to respond has expired. (Doc. 21-3, pp. 10–11.) Furthermore, the record reveals that Plaintiff did in fact file an appeal with the Commissioner's Office, but failed to wait for their response before filing this suit.

Accordingly, it is clear that Plaintiff filed his retaliation claim against Defendant Adams without providing prison officials an opportunity to resolve the facts underlying his claim. Therefore, the Court should **GRANT** this portion of Defendants' Motion to Dismiss, **DISMISS** Plaintiff's claims against Defendant Adams for failure to exhaust his available administrative remedies, and **DIRECT** the Clerk of Court to **TERMINATE** Defendant Adams from the docket of this case.[2]

## II. Plaintiff's Due Process Claims

### A. Procedural Due Process

An inmate states a cognizable claim for the deprivation of his procedural due process rights under the Fourteenth Amendment when he alleges the deprivation of a constitutionally protected liberty or property interest, state action, and constitutionally inadequate process. Shaarbay v. Palm Beach Cty. Jail, 350 F. App'x 359, 361 (11th Cir. 2009) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)). "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556, (1974). Rather, "a disciplinary proceeding, whose outcome will 'impose[ ] atypical and significant hardship on the inmate' must ensure the

---

[2] Plaintiff's Complaint only alleges facts to support a plausible retaliation claim against Defendant Adams.

10

following due process rights: (1) advance written notice of the claimed violation, (2) a written statement by the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken, and (3) an opportunity to call witnesses and present documentary evidence in his defense." Asad v. Crosby, 158 F. App'x 166, 173 (11th Cir. 2005) (citing Wolff, 418 U.S. at 563–67).

Plaintiff alleges two instances of lack of due process. First, on May 7, 2015, when Plaintiff was transferred from Rogers State Prison to Ware State Prison, he contends that Defendant Brooks, Steedley, Lowe, and Gramiak placed him in the Tier II Segregation Unit upon arrival and without an initial placement hearing. (Doc. 1-1, pp. 3, 6.)[3] Additionally, Plaintiff states that he was automatically placed in Tier II even though he was not originally located in the Tier II program in Rogers State Prison. (Doc. 25, p. 12.) Plaintiff further alleges that Defendant Brooks served Plaintiff with an administrative segregation memo, but Defendants Brooks, Steedley, Lowe, and Gramiak never gave him an opportunity to prepare a defense and failed to conduct a 90-day review. Plaintiff claims that without either the initial placement hearing or the 90-day review, he was unable to initiate the appeal process regarding his segregation. (Doc. 1-1, p. 3.)

Second, Plaintiff alleges that on February 10, 2016, following an altercation with another inmate, he received a reassignment to Tier II Phase One, again without a hearing. (Doc. 1-1,

---

[3] Plaintiff alleges that Defendants Brooks, Steedley, and Lowe comprise the Tier II Program's Classification Committee and, therefore, are responsible for his alleged due process violation. (Doc 1-1, p. 2; Doc. 25, p. 13.) Additionally, Plaintiff alleges that Defendant Gramiak is responsible because he must approve the Classification Committee's decision to place an inmate in the Tier II Program. (Doc. 25, p. 13.)

11

p. 11.)[4]  Plaintiff also alleges that Defendants did not provide him an opportunity to prepare a defense and also failed to conduct a 90-day review.

Defendants argue that Plaintiff's placement in Tier II did not result from constitutionally inadequate process because his placement "did not result from *any* disciplinary or other proceeding" and therefore Plaintiff was not owed the due process protections set forth in Wolff. (Doc. 21-1, pp. 12–13.)  Additionally, Defendants argue that Plaintiff's allegations that Defendants violated GDC policy by failing to provide an initial placement hearing and a 90-day review are simply policy violations and do not rise to the level of constitutional violations. (Id. at p. 13.)

However, Plaintiff has alleged sufficient facts, at the motion to dismiss stage, to indicate that his administrative segregation was punitive in nature and that Defendants failed to provide Plaintiff with adequate process for his placement in segregation.  In support of this allegation, Plaintiff claims that Tier II "restrictions and confinement conditions are more severe in nature than those of prisoners housed in disciplinary segregation and high-max units." (Doc. 1-1, p. 6.) Additionally, Plaintiff contends that the eligibility criteria for placement in the Tier II program "is based upon disciplinary actions of prisoners that involve assaultive [sic] or excessively disruptive behavior of either great or high severity level."  (Id.)  Thus, at this stage of the litigation, Plaintiff has alleged sufficient facts to support a plausible procedural due process claim against Defendants Brooks, Cox, Gramiak, Lowe, and Steedley.  The court should **DENY**

---

[4]  Plaintiff contends that Defendants Cox, Steedley, Lowe, and Gramiak are responsible for this second due process violation.  Defendant Cox replaced Defendant Brooks' on the Classification Committee in December 2015.  (Doc. 1-1, p. 3; Doc. 25, p. 12.)

the Motions to Dismiss as to those Defendants and **GRANT** the Motion to Dismiss as to Defendants Johnson and Boyett.[5]

### B. Substantive Due Process

"The Due Process Clause protects against deprivations of 'life, liberty, or property without due process of law.'" Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999) (quoting U.S. Const. Amend. XIV). The Supreme Court has identified two situations in which a prisoner can be deprived of liberty such that the protection of due process is required: (1) there is a change in the prisoner's conditions of confinement so severe that it essentially exceeds the sentence imposed by the court; and (2) the State has consistently given a benefit to prisoners, usually through a statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 1290–91 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

In Sandin, the United States Supreme Court addressed whether the punishment inmate Conner received for a disciplinary violation was sufficient to invoke a liberty interest protected by the Due Process Clause. 515 U.S. at 472. Following a disciplinary conviction, Conner received 30 days' disciplinary segregation in a Special Housing Unit. Id. at 475. After noting that the segregation was a form of punishment, the Court concluded that it was not a dramatic departure from the conditions of Conner's indeterminate sentence. Id. at 485. The Supreme Court held there is no right inherent in the Due Process Clause for an inmate not to be placed in disciplinary segregation nor is there a state-created liberty interest to be free from disciplinary segregation. Id. at 487. The Court determined that the conditions of disciplinary segregation at the prison where Conner was incarcerated were virtually indistinguishable from the conditions of

---

[5] Plaintiff fails to make any specific allegations against Defendants Johnson and Boyett. See Anderson v. Fulton Cty. Gov't, 485 F. App'x 394 (11th Cir. 2012) (dismissal proper where plaintiff failed to describe any specific allegations against defendant).

13

administrative segregation and protective custody. Id. at 486. Also, the Court noted that the conditions of disciplinary segregation were not markedly different from the conditions in general population. Id. The Court concluded that the conditions of disciplinary segregation did not impose an "atypical, significant deprivation in which a State might conceivably create a liberty interest." Id. Thus, the Court determined that Conner was not entitled to due process protection. Id. at 487.

The Court observed that this holding was a return to the due process principles of Wolff v. McDonnell, 418 U.S. 539, (1974), and Meachum v. Fano, 427 U.S. 215 (1976), which required an inmate to suffer a "grievous loss" before a liberty interest could be found. Id. at 478–83. The Sandin Court ruled that in the future, liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, (citations omitted), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 480, 484; see also Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998) (affirming that two months' confinement to administrative segregation was not a deprivation of a constitutionally protected liberty interest).

An inmate, therefore, has a liberty interest related to his confinement in segregation only if the state has created a liberty interest through the nature of the conditions. Sandin, 515 U.S. at 487. To determine whether the state has created a liberty interest, courts must look to the nature of the conditions of the confinement in relation to the ordinary incidents of prison life, rather than to the language of the regulations regarding those conditions. Id. at 484; Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007). Courts should also consider the duration of the confinement in segregation when determining if the confinement constitutes an atypical and

significant hardship.  See Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006); see also Williams v. Fountain, 77 F.3d 372, 374 (11th Cir. 1996).

In his Complaint, Plaintiff details various instances in which conditions in Tier II vary significantly from that of the general population.  He asserts that: his cell is completely unfurnished, he does not receive any out-of-cell recreation time, only one two-hour non-contact visit each month is permitted, he has limited phone use, no access to his personal property, and limited access to a variety of other prison resources including, among others, the prison library, the commissary, and educational, religious, and vocational opportunities. (Doc. 1-1, pp. 4–5.)  In contrast, Plaintiff alleges that general population inmates are allowed 110 hours of out-of-cell time each week (including six hours of outside recreation), eight six-hour contact visits per month, unlimited phone use, "access to general and law libraries, group religious worship services educational and vocations opportunities access to television etc."  (Id. at p. 5.)  In addition, Plaintiff alleges that his placement in segregation is indefinite.  (Id. at pp. 6, 13.)

Thus, at this stage of the litigation, taking these allegations as true, Plaintiff alleges sufficient facts to support his claim that conditions in Tier II "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." [6]  Sandin v. Conner, 515 U.S. 472, 486 (1995).  Cf. Al-Amin v. Donald, 165 F. App'x 733, 736 (11th Cir. 2006) (Liberty interest not implicated where inmates in administrative segregation "are treated similarly" to general population.  Inmates were allowed to take their personal possessions, had the same visitation and correspondence privileges, and cells were furnished

---

[6] In their Motions to Dismiss and their Replies, Defendants argue that conditions in Tier II do not implicate a liberty interest because each individual difference in condition fails to constitute an atypical and significant hardship. (Doc. 21-1, pp. 8–12; Doc. 34-1, pp. 5–9; Doc. 45, pp. 4–7.)  However, taken together, Plaintiff alleges sufficient facts at this motion to dismiss stage to support a liberty interest implication.  See Wilkinson v. Austin, 545 U.S. 209, 224 (2005) ("While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.")

15

similarly); Turner v. Warden, GDCP, 650 F. App'x 695 (11th Cir. 2016), *petition for cert. filed*, ___ U.S. ___ (Dec. 12, 2016) (No liberty interest where conditions in segregation were similar to those in the general population). Accordingly, the Court should **DENY** Defendants' Motions to Dismiss as to Defendants Cox, Brooks, Gramiak, Lowe, and Steedley and **GRANT** the Motions to Dismiss as to Defendants Johnson and Boyett.[7]

### III. Defendants' Qualified Immunity

Defendants invoke the doctrine of qualified immunity in their Motions to Dismiss. (Doc. 21-1, pp. 21–22; Doc. 34-1, pp. 13–14.) Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation[.]" Id. at 1194. "Qualified immunity should be applied at the earliest possible stage of litigation, and it is therefore appropriate to decide its applicability on a motion to dismiss. Often however, this is not possible, and for this reason it is more typically addressed at summary judgment." Horn v. Jones, No. 14-20341-CIV, 2015 WL 3607012, at *6 (S.D. Fla. May 8, 2015); see also Marshall v. Fla. Dep't of Corr., No. 10–20101–cv, 2011 WL 1303213, at *4 (S.D. Fla. March 31, 2011) ("[W]here it is not evident from the allegations of the complaint alone that a defendant is entitled to qualified immunity, the case will proceed to the summary judgment stage, *the most typical juncture at which defendants entitled to qualified immunity are released from the threat of liability and the burden of further litigation*.") (emphasis in original) (citation omitted).

---

[7] Plaintiff fails to make any specific allegations against Defendants Johnson and Boyett.

At this stage, Defendants do not contest whether the rights that Plaintiff alleges they violated were "clearly established." Rather, Defendants contend that they are entitled to qualified immunity because Plaintiff fails to sufficiently plead that they violated any constitutional right. (Doc. 21-1, p. 22 ("He cannot make this showing because, as shown above, he fails to plead a constitutional violation.")).) However, as explained in Section II above, Plaintiff has alleged conduct by Defendants that, if proven true, plausibly establishes a violation of his Fourteenth Amendment due process rights. Accordingly, at this stage of the litigation, the Court cannot dismiss Plaintiff's claims on the basis of qualified immunity. Cf. Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) ("It is therefore appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if the complaint 'fails to allege the violation of a clearly established constitutional right.'" (citations omitted)). Therefore, the Court should **DENY** these portions of Defendants' Motions to Dismiss.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **GRANT IN PART AND DENY IN PART** Defendants' Motions to Dismiss, (docs. 21, 34). Specifically, the Court should **GRANT** the October 19, 2016, Motion to Dismiss, (doc. 21), as to Defendants Johnson and Adams, and **DENY** the Motion as to Defendants Cox, Gramiak, Lowe, and Steedley. Additionally, the Court should **GRANT** the January 30, 2017, (doc. 34), Motion to Dismiss as to Defendant Boyett and **DENY** the Motion as to Defendant Brooks.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later

challenge or review of the factual findings or legal conclusions of the Magistrate Judge.  See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).  A copy of the objections must be served upon all other parties to the action.  The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.  The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED** and **RECOMMENDED**, this 11th day of April, 2017.

_____
R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA